UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION
-------------------------------------------------------------------------x
FRANCIS BEAMAN, LAURA DICKINSON, and
WENDY DEAN,

|  |  |
|---|---|
| Plaintiffs, | **COMPLAINT** |
| —against | **Case No.: 1:22-cv-474** |

ATLAS SAND COMPANY, LLC,

|  |  |
|---|---|
|  | **PLAINTIFFS DEMAND** |
| Defendant. | **A TRIAL BY JURY** |

-------------------------------------------------------------------------x

   Plaintiffs, FRANCIS BEAMAN, LAURA DICKINSON, and WENDY DEAN, by and through their attorneys, The Law Office of Clark B. Will, P.C., and Kevin T. Mulhearn, P.C. (admission pending *pro hac vice*), complaining of the Defendant, ATLAS SAND COMPANY, LLC ("ATLAS SAND" or "ATLAS"), hereby allege that:

## JURISDICTION AND VENUE

1.  This Court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1331, based upon the federal questions raised in this case: did Defendant, ATLAS SAND COMPANY, LLC, discriminate against each of the Plaintiffs on the basis of their gender (women) and/or otherwise improperly take retaliatory actions against Plaintiffs, in violation of Title VII of the Civil Rights Act of 1964, as amended.

2.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the events or omissions forming the bases of these claims occurred in this District.

## PARTIES

3.       Plaintiff, FRANCIS BEAMAN ("BEAMAN"), is an adult individual residing in the State of Wisconsin.  BEAMAN is a woman.

4.       Plaintiff, LAURA DICKINSON ("DICKINSON"), is an adult individual residing in the State of Wisconsin.  DICKINSON is a woman.

5.       Plaintiff, WENDY DEAN ("DEAN"), is an adult individual residing in the State of New Mexico.  DEAN is a woman.

6.       Defendant, ATLAS SAND, is and at all material times has been, and continues to be, a corporation doing business in the State of Texas.  At all material times, ATLAS SAND maintained, and continues to maintain, its principal office at 5918 West Courtyard Drive, Suite 500, Austin, Texas 78730.  It operates various frac sand mining operations in various parts of the United States.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.       Plaintiff, FRANCIS BEAMAN, filed a Charge of Discrimination against Defendant, ATLAS SAND, with the United States Equal Employment Opportunity Commission ("EEOC") on December 18, 2019, pursuant to a Complaint filed jointly with the Texas Workforce Commission, Civil Rights Division.    Said Charge was assigned Case No.4502020-06007.

8.       On February 15, 2022, the EEOC issued a "Notice of Right to Sue" to FRANCIS BEAMAN, which authorizes the filing of this lawsuit.

9.       Plaintiff BEAMAN has exhausted her administrative remedies and hereby files this suit within the statutory limitations period and within 90 days from the EEOC's issuance of the above-referenced "Notice of Right to Sue."

10.     Plaintiff, LAURA DICKINSON, filed a Charge of Discrimination against Defendant, ATLAS SAND, with the United States Equal Employment Opportunity Commission ("EEOC")

on December 18, 2019, pursuant to a Complaint filed jointly with the Texas Workforce Commission, Civil Rights Division.   Said Charge was assigned Case No.4502020-06008.

11.    On February 15, 2022, the EEOC issued a "Notice of Right to Sue" to LAURA DICKINSON, which authorizes the filing of this lawsuit.

12.    Plaintiff DICKINSON has exhausted her administrative remedies and hereby files this suit within the statutory limitations period and within 90 days from the EEOC's issuance of the above-referenced "Notice of Right to Sue."

13.    Plaintiff, WENDY DEAN, filed a Charge of Discrimination against Defendant, ATLAS SAND, with the United States Equal Employment Opportunity Commission ("EEOC") on December 18, 2019, pursuant to a Complaint filed jointly with the Texas Workforce Commission, Civil Rights Division.   Said Charge was assigned Case No.4502020-06007.

14.    On February 15, 2022, the EEOC issued a "Notice of Right to Sue" to WENDY DEAN, which authorizes the filing of this lawsuit.

15.    Plaintiff DEAN has exhausted her administrative remedies and hereby files this suit within the statutory limitations period and within 90 days from the EEOC's issuance of the above-referenced "Notice of Right to Sue."

## GENERAL ALLEGATIONS

### WENDY DEAN

16.    WENDY DEAN was hired by ATLAS SAND to work as Lab Manager for two new frac sand plants that ATLAS SAND was building in Kermit and Monahans, Texas.

17.    The office in Monahans was a well-appointed lab that worked perfectly for testing cores and sand from different areas of the two properties that had been purchased for the two sand plants.

18.     When WENDY DEAN arrived in Monahans, Texas, there was nothing much being built on the properties.

19.     As ATLAS SAND approached the opening date for the first sand plant, it began to hire employees to staff the plant.

20.     WENDY DEAN was asked to go to one hiring event, at which she hired two people, and then was excluded by ATLAS SAND from all other hiring events, even though all lab managers, upon information and belief, went to numerous hiring events.

21.     All of the other ATLAS SAND managers hired lab people for WENDY DEAN, thereby diminishing her authority, and providing her with treatment that was less than the treatment received by male Lab Managers at ATLAS SAND.

22.     Accordingly, the male managers at ATLAS HAND selected a number of inexperienced people for the labs before the actual start date for the Kermit Plant.

23.     By on or about February 2018, various plant managers had a meeting to discuss a way forward and how the hierarchy should look and how many people ATLAS SAND should hire. WENDY DEAN was told she would initially be assigned two supervisors—one for each plant, and 3 people for each shift.

24.     WENDY DEAN began to realize that she had nothing but inexperienced lab techs and started looking to hire some experienced people including 2 supervisors—one for each plant.

25.     She hired June Hoff as a supervisor based on the Plant Manager, Brian Vinson's, strong recommendation.

26.     On June Hoff's very first day on the job, she told staff members that were doing everything wrong and alienated and enraged the employees selected by and working for WENDY DEAN.

27.     WENDY DEAN called HR a week or so later, as the situation had worsened and morale had cratered.  She told HRI that she did not believe that June Hoff was supervisor material and should be sent back to a lower position of process operator.

28.     Thereafter, June Hoff developed personal animosity against WENDY DEAN as well as all other female employees of ATLAS SAND and actively sabotaged the careers of all the women with whom she worked at the plant.

29.     When WENDY DEAN told June Hoff that she thought June was better suited for a lower-level process operator position, WENDY DEAN told June Hoff that she hoped that the two women could work together as a team.  June Hoff told WENDY DEAN that she was sure WENDY DEAN would fail and she hoped that she would there to watch it.

30.     June Hoff had, upon information and belief, had engaged in a sexual and/or romantic relationship wit Darren Englund, and had compromising photos or videos of Mr. Englund.

31.     June Hoff, upon information and belief, used this leverage she had on Mr. Englund to advance her position with the company, while also preventing other women to ascend or achieve promotions or substantial raises.

32.     June Hoff recommended Darren Edlund for a supervisor position.

33.     When WENDY DEAN interviewed Darren Edlund, he did not display any overt misogyny and appeared to be knowledgeable about frac sand operations.  WENDY DEAN thus hired Darren Edlund to be supervisor.

34.     She also had demoted June Hoff back to Process Operator.

35.     Upon beginning at the Monahans lab, Darren Edlund began to usurp WENDY DEAN's power and authority.  Darren was able to persuade Kermit Plant Manager, Brian Vinson, to let him

stay and they had him stay in one of the ATLAS SAND-owned houses down in Monahans.   She met with him and talked about her vision for the two plants.

36.     In or about September, 2018, shortly after starting at ATLAS SAND, Darren Edlund told FRANCIS BEAMAN (who started work at ATLAS SAND on September 11, 2019) that he planned to take WENDY DEAN's job: Quality Assurance Manager.

37.     Shortly thereafter, Darren Edlund told FRANCIS BEAMAN (who started working at ATLAS SAND on September 11, 2018) that Wendy was a "dumb bitch," and she didn't know anything about being a Quality Manger for a frac sand plant because she had only worked in the oil field.

38.     Darren Edlund also told FRANCIS BEAMAN that he had planned on getting rid of several planned on getting rid of some of several black female lab technicians from Nigeria because, in part, "they were lazy." Darren called these female co-employees "Niggers."

39.     In or about March 2018, when ATLAS workers moved up to the plant, Brian Vinson instructed them to pick out an office.   WENDY DEAN picked out an office for herself and moved into it.   A few weeks after moving into her selected office, Brian Vinson told WENDY DEAN that she needed to move out, as they needed to keep an office open for when the "big-wigs" showed up.   All such "big-wigs", upon information and belief, were male.

40.     No ATLAS male employee was asked to leave his office, as ATLAS singled out WENDY DEAN for that disparate treatment. ATLAS compelled her to move into a storage room on the back of the building which was where workers performed tests when the plant started up.

41.     No other male employee of ATLAS sand was compelled to move his "office" into a storage room.

42.     In or about July 2018, ATLAS was ready to start running the plant and bring in the first truck.  They said the first truck would come on Tuesday, so on the preceding Saturday, WENDY DEAN was in Midland, Texas, trying to find some last minute sample sticks which she would need to train people on how to conduct sand testing operations on Sunday, work out any additional kinks, and be ready for the truck on Tuesday.

43.     While WENDY DEAN was in Midland, at about 11:00 a.m., Darren Edlund called WENDY DEAN and said that she better hurry because the truck would be there at 2:00 p.m.

44.     No one at ATLAS had told WENDY DEAN that the truck delivery date had been changed. Every male employee at ATLAS was aware of that change.

45.     Brian Vincent and Darren Edlund had begun to exclude WENDY DEAN from important meetings and—as the two shared a house—otherwise plotted to remove WENDY DEAN from her position in order for Darren Edlund to take over.

46.     Brian Vincent had already begun calling Darren Edlund and the two would have important meetings while specifically excluding WENDY DEAN from those meetings.

47.     When Darren called about the truck, WENDY DEAN asked him to get a few last minute details together and try to show the workers what they needed to do with the sand.  As the truck was late, everything went off without a hitch.

48.     The next day, however, Hunter Wallace, ATLAS's Chief Operating Officer, called WENDY DEAN into an office, and told her that he was very disappointed in her that she was not prepared for the initial truck delivery of sand to the plant.   WENDY DEAN did not respond.

49.     In or about July 2018, ATLAS SAND had an issue in the wet plant lab one night where a female lab technician claimed that one of her co-workers had sexually assaulted her.

50.     This female lab technician, who was directly supervised by DEAN, filed a sexual harassment complaint with ATLAS's Human Resources Department.

51.     As this issue involved the alleged disparate treatment of women at the workplace at ATLAS, and a complaint by a technician who was supervised by WENDY DEAN, WENDY DEAN should have been involved as a witness and/or should have had input as to the matter and its investigation and resolution.   Instead, ATLAS excluded WENDY DEAN from all involvement in the investigation and never called her as a witness.

52.     Darren Edlund advised WENDY DEAN how ATLAS had resolved the matter the following morning.   WENDY DEAN told Brian Vincent and Mike Simmons (Superintendent) that she should have been called about any issues that involved her lab technicians.

53.     Brian Vinson told WENDY DEAN that they were his employees, and he did not need to include her in the matter.   He did not tell her why he included Darren Edlund, a male and WENDY DEAN's supposed subordinate, in the matter, while excluding her.

54.     WENDY DEAN became angry and spoke with her boss, a man, and asked him "why did they hire a manager, who is not allowed to manage?"

55.     They were her employees.   At the time, Hunter Wallace told DEAN that he agreed with her and that he would speak with Brian Vinson about this issue.   Upon information and belief, he never did.

56.     One day, in or about September 2018, Brian Vinson and WENDY DEAN were in his office discussing upcoming employee reviews.

57.     He asked WENDY DEAN to sit with him and see if they could come up with a better pay scale to get people paid more in range commensurate with their abilities and performance.

58.     During this process, WENDY DEAN and Brian Vinson discussed what she thought of some of their performances.  Most were doing well, and WENDY DEAN said as much.  A couple, whom WENDY DEAN had high hopes for, could be doing better.

59.     As it was time to do performance appraisals and the process had never been set in place, WENDY DEAN made her own appraisal sheet and began filling them out for all the employees. She sent out an email to her supervisors and asked each of them if they would like to receive a copy of her appraisals.

60.     That same night, Brian Vincent did his own appraisals for all of WENDY DEAN's employees and told them, they all were all doing a terrible job, which was not the case.

61.     The next day, WENDY DEAN received a phone call from Kirk Ginn, ATLAS's Human Resources manager in Austin, and he was mad at her for taking the initiative to perform the appraisals.

62.     He advised that "there was a system in place" even though that was patently false, but Brian Vinson, in an effort to have WENDY DEAN fired, had likely told him that.

63.     About two weeks later, in or about September 2018, WENDY DEAN had been working day and night for a long time and had not slept the night before.  She told Darren Edlund that she was going home to take a sleeping pill and go to sleep.  She lived more than an hour away and was making that long commute almost every day.  Darren Edlund and Brian Vinson lived 15 minutes away in Kermit.

64.     As the supervisor, Darren Edlund should have been taking care of the day-to-day issues at the plant. WENDY DEAN had taken the pill and was practically asleep, when one of her subordinates called her and told her that there were a lot of bad trucks.  Apparently, some very bad

trucks went out.   They had tried to call both Darren Edlund and Brian Vinson several times but they did not answer.

65.     WENDY DEAN came in the next morning and Brian Vinson yelled at her and told her that she should have stopped the plant.   WENDY DEAN realized that Brian Vinson and Darren Eglund's strategy had finally paid off, as Brian Vinson had already called the bosses in Austin.

66.     ATLAS SAND fired WENDY DEAN that day right after the morning meeting in or about October 2018.

67.     This termination of employment was an adverse employment action and was the inevitable result of ATLAS's blatant sex discrimination of women and its disparate treatment of WENDY DEAN, in multiple levels and in multiple ways.

68.     The actions of ATLAS towards WENDY DEAN were part of a continuing pattern and practice of ATLAS SAND to discriminate against women but WENDY DEAN was not made aware of this continuous pattern and practice until after speaking to BEAMAN and DICKINSON after BEAMAN (constructively) and DICKINSON were terminated by ATLAS.

69.     ATLAS's conduct towards WENDY DEAN constitutes a continuing violation in that, as demonstrated by the allegations of BEAMAN and DICKINSON, the separate acts of ATLAS against women, DEAN, BEAMAN, and DICKINSON were related and inextricably intertwined, ATLAS's discrimination against women at the plant was continuing and uninterrupted, and the doctrine of continuing violation serves the Court's equitable powers and Title VII's remedial purposes.

## ALLEGATIONS PERTAINING TO LAURA DICKINSON AND FRANCIS BEAMAN

70.     LAURA DICKINSON was recruited by ATLAS and began work with the company on September 12, 2018 as a Senior Lab Technician.

71.     Within the first month of being employed, she felt as if she was being discriminated against because she was a woman.

72.     LAURA DICKINSON was told when she was interviewed by Lab Manager, WENDY DEAN, that she would advance very quickly because of her many years of experience as a quality assurance specialist in sand mining and that ATLAS had little experienced help.

73.     Not long after LAURA DICKINSON was hired by the company, WENDY DEAN was terminated and Darren Edlund, who was the lab supervisor, was promoted to Lab Manager.

74.     Darren Edlund was a misogynist and a racist and he did not make even the slightest effort to hide his disdain for women in the workforce.

75.     BEAMAN was hired by ATLAS on or about September 11, 2018 and began to work as a Senior Lab Technician.

76.     BEAMAN'S and DICKINSON's supervisor, June Hoff, made it almost impossible for BEAMAN and DICKINSON to continue working at ATLAS because she didn't like BEAMAN or any other women.

77.     June Hoff made comments before BEAMAN was hired there about employing BEAMAN and BEAMAN's husband, Nate. From the beginning of her work at ATLAS, upon information and belief, June Hoff felt that BEAMAN was a threat to her job.

78.     While employed there were numerous occasions of harassment from other male co-employees who were friends with June Hoff.

79.     BEAMAN's private locker was repeatedly broken into by, upon information and belief, her male co-workers, and her bathroom was continually vandalized.

80.     Several of the male lab technicians would come into the locker room and purposefully urinate all over our bathroom and toilet.

81.     The lock that was put on BEAMAN's locker was torn off and, despite her numerous complaints to ATLAS management, this disgusting behavior continued.

82.     In or about December 16, 2018, BEAMAN tried to address these issues with a previous supervisor, Eric Hammes, but he did not take any remedial action.

83.     After Darren Edlund became Lab Manager, there was never any further mention of any opportunity for LAURA DICKINSON to move up as to a supervisor position.  In fact, ATLAS did not even post notices for any supervisor positions.  The other lab techs and LAURA DICKINSON continued to work with little supervision for about one and 1/2 months. Men outnumbered women in the labs.

84.     Sometime in November, 2018, DICKINSON and BEAMAN arrived at work only to find out that two men not ATLAS employees, Eric Hammes and Travis (Surname Unknown), had been hired as Lab supervisors at ATLAS.  One was hired to supervise the North plant and other one was hired to supervise the South plant.  Both had very little or no experience in sand quality assurance. Neither had nearly as much experience as LAURA DICKINSON or FRANCIS BEAMAN, who were not even advised that a supervisor position was open before ATLAS filled it with two men with limited experience.

85.     Travis ended up quitting soon after his hiring, and ATLAS then gave another outside male candidate, Joe Spencer, received Travis's position.

86.     The lab work regularly performed by DICKINSON and BEAMAN was some of the most physical work at the mine.  The work consisted of taking sand samples in the dry plant screen tower every hour and many times more than once an hour if the product was failing.  Dry plant Lab technicians on average climbed about 600 stairs in a twelve and 1/2 hour shift.

87.     In the wet plant to retrieve samples, employees needed to walk through sand to the sample beds which consisted of about 300 stairs a shift.  Their schedule was a rotating schedule fourteen days on and seven off then fourteen nights on and seven days off.

88.     When LAURA DICKINSON and FRANCIS BEAMAN were hired by ATLAS they performed their work diligently and accurately the entire time they worked at ATLAS.

89.     They had no problems physically doing the work and always followed instructions.

90.     When LAURA DICKINSON was hired, she was initially sent to work in the wet plant.  She had to mention working in the dry plant and is not sure if ATLAS would have stationed her in the dry plant had she not suggested it.

91.     Darren Edlund wanted FRANCIS BEAMAN, her co-worker, to work primarily mainly in the Dry plant.

92.     LAURA DICKINSON's then-fiancée, Mike, were sent to the South plant when it started up as that was where they were initially designated to work.

93.     When, Mike was promoted to supervisor not long after, ATLAS invoked the company's anti-nepotism policy and made LAURA DICKINSON return to the North lab to work.

94.     When LAURA DICKINSON asked her manager, Darren Edlund, where she was to work at the North plant lab, he told her in the "wash plant as FRANCIS BEAMAN was in dry plant and she and LAURA DICKINSON were both senior lab technicians and seniors could not work together! "No rotation required!

95.     The only time ATLAS permitted DICKINSON and BEAMAN to work together was when either one of their stations were down.

96.     Women who worked out in the plant were forced to use the same bathroom as the men.

97.     In October 2018, Plaintiffs started the conversation about having separate bathrooms for females and males. At the time the only bathroom we had was a porty potty that was being used for by everyone including the contractors.   BEAMAN and DICKINSON made a proposal to Darren Edlund for ATLAS to get female workers their own bathrooms down by the lab.   Plaintiffs had informed Darren Edlund that dirty and unsanitary conditions existed in that, for instance, there was often feces and/or urine on the toilet seat, the bathrooms were not maintained on a regular basis, and frequently ran out of toilet paper.

98.     Darren Edlund told Plaintiffs he would look into these issues but weeks turned into months and ATLAS still did not provide its female employees with a separate bathroom.  ATLAS put a bathroom closer to the lab but that bathroom had the same issues as before.

99.     The female lab technicians requested their own bathroom with a lock and key.

100.    LAURA DICKINSON and FRANCIS BEAMAN made this request to numerous supervisors on numerous occasions.

101.    Their requests fell on deaf ears and were consistently ignored, until DICKINSON mentioned to Meghan Wiseman in Human Resources the dirty and unsanitary conditions at ATLAS for females.

102.    On or about October 26, 2018, Meghan Wiseman then called a meeting with manager Darren Edlund and dry plant Superintendent Nate Sing and questioned them as to why women employees did not yet have their own porta-potty.

103.    Soon after, on or about January 30, 2019, ATLAS delivered a bathroom (a porta-potty) to the plant for the use of females only, but that bathroom—delivered pursuant to Plaintiffs' pleas to HR, caused the male employees of ATLAS, including the supervisors, much resentment and bad feelings.

104.    On or about February 6, 2019, Plaintiffs received a port-a-potty bathroom but male employees of ATLAS almost immediately set about to make this bathroom disgusting and unusable for them.

105.    For six months, male employees of ATLAS frequently broke into the bathroom, and urinated all over its fixtures, and left feces on the toilet seat.

106.    Plaintiffs received their own bathroom in the beginning of December, 2018.

107.    On December 16, 2018, BEAMAN came into work to find that her locker had been vandalized and a key to the bathroom had been stolen.

108.    BEAMAN reported this violation of privacy to her shift supervisor, Keith Miller, so he could see what had happened.  She also reported it to supervisor Eric Hammes who said he would talk to Darren Edlund about the situation.   ATLAS, however, never conducted an investigation and never conducted any remedial or mitigation actions.  ATLAS management never even asked other shifts if they knew what had happened to BEAMAN's locker.

109.    At one point, BEAMAN's husband Nate overheard BEAMAN's male lab co-workers  call BEAMAN a bitch.

110.    BEAMAN and DICKINSON maintained notebooks to record for between different shifts the various incidents at the lab.  BEAMAN's and DICKINSON's male co-workers frequently mocked and ridiculed BEAMAN's and DICKINSON's notebooks and called Plaintiffs various epithets, including "bitch."

111.    all these incidents where address wit Darren and Eric. I felt my situation in the lab wasn't going to get any better. I was doing my best to follow the chain of command when I addressed all these issues. Laura, Sable, Rachel, Helen, Abby and I for months had been putting up with this behavior. Helen was a huge target of severe discrimination as a woman and also, she was Nigerian.

112.    In the last week in January, 2019, ATLAS moved the women's bathroom to over by the dry plant operator.   Plaintiffs were very upset at this point, as there was no rational reason to take away the women's bathroom from the female lab technicians at ATLAS.

113.    Plaintiffs again requested from ATLAS management a bathroom for their use, but ATLAS did not provide them with another port-a-potty until February, 2019, even though Plaintiffs had made a request for it in October, 2018.

114.    Plaintiffs then put a lock on the bathroom door but, upon information and belief, male co-workers frequently broke into and vandalized this women's bathroom.

115.    Plaintiffs tried several different locks but the bathroom kept getting broken into and left in disgusting condition, with urine all over the place and feces on the toilet seat.

116.    On one occasion, Plaintiffs discovered urine all over their entire bathroom like someone decided to urinate everywhere even on the clean toilet paper or they would piss off the screen tower and it would be all over the porty potty. It was absolutely disgusting.

117.    Plaintiffs brought this incident to Darren Edlund's attention but again nothing was done about it.

118.    In or about November 2018, Plaintiffs were told by Mr. Sing and Mr. Edlund, along with plant Manager Brian Vinson, that their lab buggy—which they needed and regularly used to traverse much difficult terrain— would be taken away.  Plaintiffs needed that buggy, moreover, to perform their lab technician duties more efficiently.

119.   DICKINSON, in particular, needed the buggy (ATV) to perform her work efficiently because she was required to walk long distances to the lab and to get sand samples during her shift.

120.   Plaintiffs noticed that other male co-workers at ATLAS, including lab technicians, were given full use of the buggy (ATV) during their shifts.  They noticed this restriction only pertained to their shifts at the plant.  It took several months before Plaintiffs were able to get the buggy back and this occurred only was because there were issues with coyotes being spotted wondering around the plant at night.

121.   Sing, Edlund, and Vinson made clear to Plaintiffs that management had removed the buggy for their use in direct and specific retaliation for Plaintiffs' repeated complaints to management about the deplorable bathroom conditions at the plant.

122.   ATLAS treated Plaintiffs, all women, differently and unfairly as compared to how it treated Plaintiffs' male counterparts, as all male lab technicians had full and unfettered use of a buggy during the entirety of Plaintiffs' employment tenures at ATLAS.

123.   Karl Blackwell, one of the male lab techs who worked on a different crew opposite Plaintiffs BEAMAN and DICKINSON, habitually harassed all of the female lab techs, including Plaintiffs.

124.   He would leave his disgusting chew spit cup in the lab all the time.  He would leave garbage as well.  When BEAMAN and DICKINSON complained to Edlund about this conduct, nothing was done about it.

125.   On one of their shifts, after Karl Blackwell's shift, Plaintiffs noticed that the women's locker had been broken into, one of the bathroom keys had disappeared, and the bathroom—which Plaintiffs strained to keep clean and orderly—was left a gross and dirty mess with urine all over the place.

126.    On or about December 27, 2018, Plaintiffs BEAMAN and DICKINSON raised these incidents with Eric Hammes, Darren Edlund, and Nate Sing, but no punitive or remedial action was taken against Karl Blackwell, and his disgusting behavior towards women at the plant was allowed to continue.

127.    In or about early 2019, Eric Hammes resigned from his lab supervisor role because the company changed its mind on scheduling.

128.    Around the time that Eric Hammes stepped down, company-wide self-assessments for Plaintiffs' reviews were due on April 22, 2019.

129.    Plaintiffs DEAN and BEAMAN completed their self-assessments but never received a formal review form ATLAS or their supervisors about their job performances.

130.    Plaintiffs were again treated less favorably than male employees, as all other male lab technicians were given their formal reviews by ATLAS.

131.    On or about March 3, 2019, after Eric Hammes stepped down, Plaintiffs noticed that June Hoff, who was a dry plant operator on a different crew, was not running the dryers anymore but had been allowed to ride around with the shift supervisor for about two weeks.

132.    Plaintiffs started hearing rumors that June Hoff was replacing Eric Hammes.  Plaintiffs were very concerned about this because Miss Hoff had a reputation for being hostile to women in the workplace and she was also good friends with Karl Blackwell, Plaintiffs' chief harasser.

133.    June Hoff also had admitted to more than one employee that when Darren Edlund and she worked in Wisconsin together, they were intimately involved.

134.    Plaintiff DICKINSON confronted Darren Edlund one day in the lab about June Hoff getting the lab supervisor position and voiced her concerns because DICKINSON knew that she had a criminal record for assault and battery, disorderly conduct, and theft.

135.    Edlund asked Plaintiff DICKINSON where she had heard that June Hoff was to be the plants' new supervisor. DICKINSON told Edlund that they had heard that information from reliable sources.

136.    Mr. Edlund then told DICKINSON that the rumor was not true and those were not very reliable sources.  Within the next week, however, ATLAS hire June Hoff as the plant's Lab supervisor.

137.    Upon her elevation to that position, June Hoff began an active campaign to target, ridicule, disparage, and humiliate all women employees at ATLAS, particularly Plaintiffs.

138.    In or about July 2019,  Rachel Johnson, another female lab technician, quit her position at ATLAS because she was forced to work with Karl Blackwell.

139.    She expressed concerns to ATLAS management that Karl Blackwell had engaged in myriad misconduct and generally treated her and other women workers in a demeaning and dehumanizing manner, and that June Hoff had engaged in blatant discrimination and created a hostile work environment for women employees at ATLAS.

140.    ATLAS management, however, failed to address any of these women's legitimate complaints and concerns and failed to take any remedial or punitive actions in response to Rachel Johnson's expressed complaints and concerns.

141.    From April 2019 through August 2019, while Ms. Hoff was Plaintiffs' supervisor, Mr. Edlund and Ms. Hoff the women in the lab experienced constant harassment and targeting by Ms. Hoff and Mr. Edlund.  They both made the lab a very hostile workplace for all the women.

142.    In or about June 2019, Darren Edlund and June Hoff started implementing a work rotation between wet and dry plants only because one or two male lab technicians wanted to work there because the workload was easier and they could get away with more.

143.    This policy shift was blatantly discriminatory against women, increased the difficulty of the lab technician work for women employees, and made no sense from a business standpoint.

144.    ATLAS also told Plaintiffs that the South plant was rotating between their wash and dry plants as well which was a lie as the lab techs who worked there told DICKINSON themselves that they were not rotating.  This rotation meant that the seniors would need to work together at times and that was forbidden previously.

145.    Plaintiff DICKINSON, in acquiescence to ATLAS's discriminatory policy, rotated between the dry plant and the wet plant more than any other lab technicians for ATLAS.

146.    June Hoff frequently berated and disparaged Sable Oliphant, a female lab technician, until ATLAS terminated Sable Oliphant on or about July 22, 2019.

147.    After Sable Oliphant was terminated, Ms. Hoff also complained to Plaintiffs about Abi Oladunjoye, a female lab technician who was going to be coming back from maternity leave.

148.    June Hoff expressed her skepticism about ATLAS granting such generous terms for maternity leave for women which further demonstrated her hostility towards female co-workers..

149.    Abi never came back to work at ATLAS.

150.    Beginning in May 2019, and throughout their tenure at ATLAS, June Hoff plotted and worked to substantially diminish Plaintiffs' job duties and responsibilities.

151.    Beginning on or about June 13, 2019, June Hoff held a number of private meetings about vital ATLAS business with ATLAS's male lab technicians, Karl Blackwell, Shawn Rubino, Alejo Garza, and Bradley Durughbor.

152.    Plaintiffs BEAMAN and DICKINSON were only two senior lab technicians whom she deliberately excluded us from these meetings.    This disparate treatment prevented Plaintiffs have performing their job duties as efficiently as possible.

153.   Beginning in July 2019, Ms. Hoff unilaterally decided to no longer speak directly with Plaintiffs BEAMAN or DICKINSON.   ATLAS employee, Alejo Garza, confessed to DICKINSON that Ms. Hoff stated to him that she would not communicate directly with BEAMAN and DICKINSON, but would only communicate with them through him (as a conduit). Ms. Hoff spoke directly to all male lab technicians at ATLAS.  This disparate treatment hindered Plaintiffs from performing their job responsibilities as efficiently as possible as they no longer were involved in any direct chain of command at the plant.

154.   On or about June 17, 2019, Ms. Hoff also implement new testing exclusively with the male lab technicians and again specifically excluded BEAMAN and DICKINSON from those new testing protocols.

155.   All of these acts diminished BEAMAN's and DICKINSON's work responsibilities and constituted materially adverse employment actions which prevented Plaintiffs from performing their work duties and put them at a significant competitive advantage with the male lab technicians at ATLAS, who received direct lines of communications with Ms. Hoff and training and expertise as to protocols that was denied Plaintiffs as and only because they were women.

156.   BEAMAN AND DICKINSON were very good at their jobs and always followed protocol.  Ms. Hoff had very little experience in the lab.  She would cause a lot of confusion by constantly changing the testing specifications.  She never gave a clear definition of the job expectation.  All the lab techs had been pretty much running the labs and making changes on their own before her supervisor role and Darren Edlund was rarely present at the lab.

157.   Ms. Hoff had been lab supervisor for a couple of weeks when she called a meeting for blue team lab on June 20, 2019.  This meeting consisted of BEAMAN, DICKINSON, Alejo, Mr. Edlund and Ms. Hoff.  They were told during the meeting that the reason behind the meeting was

just so that everyone was on the same page in the lab and that they would be holding this meeting for the two other teams as well.

158.    During the meeting Darren was pointing out what the sand spec needed to be at and that BEAMAN and DICKINSON needed to rotate and that the south plant was rotating so they needed to also.  They were already doing these things! The meetings with the other two teams never took place.  Plaintiffs were being lied to and targeted because they were women.

159.    When DICKINSON was terminated, in Ms. Hoff's statement, she stated that in this meeting DICKINSON was insubordinate, not doing testing, not following direction, and not following procedure.  Each of these allegations was completely and patently false.

160.    On June 25, 2019, DICKINSON was called into a meeting with April from Human resources, Darren Edlund, and June Hoff.  They questioned her about an incident the day before when BEAMAN stuck up for a coworker Bradley Durugbor.  Bradley was constantly bullied by Karl Blackwell.  DICKINSON told them BEAMAN mentioned to Bradley he should go to HR about it and that they knew that Karl was making up his numbers in the lab.  DICKINSON also told HR, Mr. Edlund and Ms. Hoff that she believed BEAMAN and Bradley because DICKINSON had been noticing the turbidimeter machine results were always erased after Karl Blackwell's shift, which meant he probably was not doing that mandated test.

161.    In that meeting, they focused on the alleged "problem" of BEAMAN talking about someone (Karl Blackwell) rather than Karl Blackwell's gross misconduct and mistreatment of women as the problem.  Also, when DICKINSON was fired, Darren Edlund and June Hoff stated that she was verbally warned to not make false and unsubstantiated accusations against Karl Blackwell.  They never once stated, suggested, or even insinuated that in the meeting.  It was

obvious that ATLAS managerial employees were trying to target BEAMAN and DICKINSON with falsehoods in an effort to drive them from the company.

162.     Mr. Edlund and Ms. Hoff continued to harass and target BEAMAN and DICKINSON.  On one particular day it was almost 110° and they kept pushing BEAMAN and DICKINSON to run upstairs to get more samples unnecessarily.  They also made BEAMAN and DICKINSON walk to the office which is about 1/3 of a mile through sand three times that day to have meetings to question their testing as if they were not doing their jobs correctly.

163.     When Eric Hammes was BEAMAN and DICKINSON's supervisor, he sent them a text referring to them saying "Working with every crew, it's easy to spot where the talent lies."  Darren Edlund or June Hoff could have picked them up in the buggy that day but chose not to do so.  By the end of the shift, BEAMAN and DICKINSON we were completely exhausted.  When BEAMAN came to clock out she was crying and told DICKINSON and a few other co-workers she could not do it anymore.  She was at a breaking point.  DICKINSON felt the same way and that night she came down with some symptoms of heat exhaustion.

164.     At no time did Darren Edlund or June Hoff ever push any male lab technicians to the point of heat exhaustion or physical collapse.  They reserved that treatment for the two targeted women: BEAMAN and DICKINSON.

165.     On July 31, 2019 Thursday when DICKINSON came into work, Ms. Hoff was in the lab along with Karl Blackwell, B.D., A.G., and S.R., she told DICKINSON they were going to start an every two day rotation between labs.  DICKINSON became upset because of the constant harassing she was doing to BEAMAN and DICKINSON about this when DICKINSON was already rotating.  DICKINSON has many texts to prove this as that was the only way to communicate efficiently.  DICKINSON walked away and said "continue to treat us like children."

166.    When BEAMAN arrived there, there was a short discussion with Ms. Hoff and lab techs about this rotation.  When Ms. Hoff left, BEAMAN and DICKINSON continued to discuss this with some of their coworkers and mentioned to them that there are rumors about Darren and June being together and if they are in fact true then June should not be their supervisor.  Those coworkers, who are all male, then went to June Hoff and Darren Edlund and told them what BEAMAN and DICKINSON had said.

167.    Friday morning, at the end of their shift, as BEAMAN and DICKINSON were clocking out, June had the lab door locked and was having a meeting with the male lab techs.  Again, BEAMAN and DICKINSON were excluded from this meeting.  June was very controlling and did not like women.  At that point, she had succeeded in driving out all of the women employees in the lab except BEAMAN and DICKINSON.

168.    Then the next day, which was August 1, 2019, Friday, April from HR called DICKINSON at the camp and told her she needed to stay home from work and come back in on Monday night.  HR was going to do an investigation on an incident that happened in the lab. She was not sure of anything.  DICKINSON asked her if she was suspended and she replied she was not sure but that they just needed to do an investigation.

169.    Monday came around and DICKINSON was getting ready for work and Meghan HR called and told me her she needed to stay home Monday night as well and asked if she could come in the next day.

170.    Kirk Ginn, Head of HR, would talk to DICKINSON then.  DICKINSON told her she couldn't come in on Tuesday because it was her week off and she would be flying home then.  DICKINSON told Meghan she needed to know what was going on!  Was she being

fired?  Was she going to be paid for the days off?  DICKINSON needed to know if she should even come back to Texas since she lived out of state.

171.    She said that she didn't know what was going on and she would have Kirk Ginn call DICKINSON.  When Kirk called, he told DICKINSON he didn't see any reason that she would not have her job and that she was not suspended and would be paid for the days off.  He just needed to finish the investigation.  He told DICKINSON he would call her by the end of the week and let her know what was going on.  He did not call until the following Monday, when she was scheduled to fly back.  He called and said they conducted their investigation and that there were some concerns with a couple of Atlas employees, including DICKINSON, and that they were severing their employment relationship with her.

172.    DICKINSON filed for unemployment on August 18, 2019 and ATLAS challenged her right to unemployment benefits.  In fact, ATLAS made a number of false statements from five male lab techs, as well as false statements from Mr. Edlund and Ms. Hoff, in DICKINSON's unemployment hearings and proceedings.

173.    DICKINSON was given no verbal or written warnings for anything at Atlas.  There is likewise no documentation of any misconduct on her part.   HR admitted this during DICKINSON's unemployment appeal hearing.

174.    DICKINSON's termination from ATLAS SANDS has caused extreme hardship for her and her family, financial loss, lost wages and earnings, as well as severe emotional distress and mental pain and suffering.  DICKINSON's fiancée, Mike, still works at Atlas Sand and he still lives in Texas while DICKINSON lives in Wisconsin.  All of this has strained their relationship a great deal.

175.    DICKINSON feels with the utmost certainty that she was discriminated against at Atlas and treated with so much disrespect and received an unjust termination especially because she was a very loyal employee that worked very hard at her job to help the company to succeed in the industry.

176.    DICKINSON was discriminated against by being subjected to an extraordinarily hostile work environment, denied any opportunity for promotion or advancement, subjected to inferior work assignments and pay, and excluded from important training programs, meetings, and testing protocols.

177.    BEAMAN'S Quality Manager, Darren Edlund, also didn't like women and was an extreme racist.  When BEAMAN tried to speak to him about these things that were happening, he ignored her and her frequent reasonable complaints.

178.    BEAMAN frequently tried to bring up quality control issues but Darren Edlund ignored these complaints as well.  He made BEAMAN feel that because she was a woman, her feelings and beliefs about work issues and the hostile work environment that he fostered and condoned did not matter at all.

179.    June Hoff, who was BEAMAN's last supervisor, would only call meetings addressing BEAMAN and DICKINSON and not the other male lab technician on other shifts. She unquestionably targeted the women that worked at the lab and eventually was successful in firing or pushing out each and every woman who had worked in the lab.

180.    June Hoff implemented numerous policy and practice changes that were designed to benefit and exclusively favor the men in the lab.

181.    BEAMAN tried to stick up for a co-worker who was being harassed but it was turned around and made to look like BEAMAN was the one doing the harassment.

182.    On BEAMAN's final day at ATLAS SAND, she was called and asked to stay home for no legitimate reason. BEAMAN felt from the extreme stress from the last few weeks, that her ATLAS superiors were just not willing to just let her do her job in a reasonable work environment.

183.    The Monday BEAMAN was supposed to return to work, she didn't go back because the person who had harassed her was put on her team to cover for her absence. BEAMAN's husband, Nate, didn't feel comfortable working with him and raised the issue with the plant manager and HR director but because Nate expressed concern about how BEAMAN was being treated, he was asked to leave the premises.

184.    June Hoff and Darren Edlund were very much aware of the gender discrimination issues they were causing and condoning. BEAMAN asked to be transferred but was told she could not transfer even though there were openings at the other plant.

185.    On or about July 2, 2019, BEAMAN contacted her Human Resources Director at ATLAS, Aril Murphy, and told her that she felt things were not going to get any better so BEAMAN would not be returning due to all the harassment and mistreatment that she had been forced to endure.

186.    BEAMAN was discriminated against at Atlas and treated with much disrespect and received an unjust constructive termination.  BEAMAN was a very diligent and loyal employee who worked hard at her job to help the company succeed and did not deserve such poor treatment.

187.    BEAMAN was discriminated against by being subjected to an extraordinarily hostile work environment, denied any opportunity for promotion or advancement, subjected to inferior work assignments and pay, and excluded from important training programs, meetings, and testing protocols.

188.    BEAMAN's employment at ATLAS was constructively terminated by ATLAS as a reasonable person would not have been expected to return to work at ATLAS given the prolonged

harassment, poor treatment, and disparaging, dehumanizing, and humiliating treatment that ATLAS subjected her to for a prolonged period of time and for which ATLAS had no plans or intentions to remediate or mitigate in any way.

189.    BEAMAN's constructive termination from Atlas Sands has caused extreme hardship for her and her family, financial loss, lost wages and earnings, as well as severe emotional distress and mental pain and suffering.

190.    As a result of the discrimination BEAMAN suffered because she is a woman, BEAMAN was unfairly and maliciously constructively terminated from employment at Atlas Sand.

### COUNT I:  DISCRIMINATION ON THE BASIS OF SEX, INCLUDING WRONGFUL DISCHARGE AND DISPARATE TREATMENT, IN VIOLATION OF TITLE VII

191.    Plaintiffs hereby repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as if each has been fully set forth at length herein.

192.    Title VII makes it an unlawful employment practice "for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's …" (42 U.S.C. § 2000e-2(a)(1).

193.    Each Plaintiff herein alleges that Defendant ATLAS subjected her to disparate treatment in violation of Title VII because ATLAS intentionally treated each Plaintiff employee unfairly because of her sex and gender (female).

194.    Plaintiffs allege direct evidence of Defendant ATLAS's discrimination against Plaintiffs and other women based on the aforesaid comments of Darren Edlund, which demonstrate the sex-based animus of ATLAS against woman, including each Plaintiff.

195.    Such direct evidence, if believed, will prove the fact of Defendant ATLAS's intentional discrimination against women, including each Plaintiff.

196.     Such discriminatory comments, moreover, were directly related to Defendant's sex-based animus; proximate in time to the adverse employment actions suffered by each Plaintiff; made by Darren Edlund, an individual with authority and influence over Defendant ATLAS's employment/decisions (i.e. adverse employment actions) to: (1) significantly diminish Plaintiff DEAN's role and responsibilities at ATLAS; (2) terminate Plaintiff DEAN's employment at ATLAS; (3) significantly diminish Plaintiff DICKINSON's role and responsibilities at ATLAS; (4) terminate Plaintiff DICKINSON's employment at ATLAS; (5) significantly diminish Plaintiff BEAMAN's role and responsibilities at ATLAS; and (6) constructively discharge Plaintiff BEAMAN's employment at ATLAS.

197.     Moreover, each Plaintiff at all material times: (1) was a woman and thus a member of the protected class; (2) was qualified for her position of employment at ATLAS; (3) suffered adverse employment actions including substantial demotion of her role and responsibilities at ATLAS (DEAN, DICKINSON, and BEAMAN); wrongful termination of her employment at ATLAS (DEAN and DICKINSON); wrongful constructive discharge of her employment at ATLAS (BEAMAN); and (4) was treated less favorably by men outside of their protected class, including Darren Edlund (the man given DEAN's position as Lab Manager) and the men who replaced DICKINSON and BEAMAN as lab technicians at ATLAS.

198.     Plaintiff BEAMAN's decision to leave her employment at ATLAS constitutes a constructive discharge in that, both objectively and subjectively, in view of the totality of the circumstances and Defendant's confirmed shabby treatment of Plaintiff BEAMAN, a reasonable person would have concluded that she had no reasonable choice other than to tender her resignation from ATLAS.

## COUNT II:  DISCRIMINATORY RETALIATION IN VIOLATION OF TITLE VII

199.    Plaintiffs hereby repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as if each has been fully set forth at length herein.

200.    At all material times, Plaintiffs DICKINSON and BEAMAN participated in a Title VII protected activity by, *inter alia*, complaining to ATLAS management about the disparate treatment afforded to women at ATLAS, including numerous complaints to ATLAS's Human Resources Department about hostile and substandard working conditions at ATLAS.

201.    Such complaints include those about ATLAS's failure to provide them their own bathroom, and ATLAS's failure to take any remedial action once they complained about the humiliating and emotionally devastating impact of their male co-worker's desecration, destruction, and befouling of the belated bathroom they did receive.

202.    In addition to the aforesaid adverse actions (loss of employment, diminishment of job responsibilities) Plaintiffs suffered shortly after their aforesaid protected activities, Defendant ATLAS further retaliated against Plaintiffs DICKINSON and BEAMAN by preventing them from using the buggy, which ATLAS permitted all similarly situated male employees to use, and which substantially worsened and made more onerous and physically taxing the terms and conditions of their employment.

203.    Defendant ATLAS's male employees, including Edlund, told Plaintiffs BEAMAN and DICKINSON in no uncertain terms that they had lost the use of the essential buggy in direct response to their complaints to ATLAS management about the deplorable bathroom conditions.

204.    This is textbook retaliation.

205.    There is a direct and proximate causal connection between Plaintiffs' aforementioned protected activities and the adverse employment actions of ATLAS against Plaintiffs.

206.    At all material times, a reasonable employee would have found the aforesaid actions of Defendants "materially adverse," and the actions may well have dissuaded a reasonable worker from making or supporting a charge of discrimination against ATLAS.

## COUNT III:   SEX DISCRIMINATION THROUGH THE CREATION OF A "HOSTILE WORK ENVIRONMENT" IN VIOLATION OF TITLE VII

207.    Plaintiffs hereby repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as if each has been fully set forth at length herein.

208.    At all material times, Plaintiffs belonged to a protected class—women.

209.    At all material times, each Plaintiff was subjected to unwelcome sexual harassment at ATLAS by both supervisors, co-workers, and subordinates.

210.    At all material times, Defendants' and their respective agents and employees directed their harassment towards Plaintiffs based on the fact that the Plaintiffs were all women.

211.    At all material times, the above-referenced harassment of Defendant ATLAS and its agents and employees affected the terms, conditions, or privileges of each Plaintiff's employment.

212.    At all material times, the above-referenced harassment of Plaintiffs by Defendant and its agents and employees, acting within the scope and authority of their employment, affected the terms, conditions, and privileges of Plaintiffs' employment because it was severe, physically threatening, humiliating, and unreasonably interfered with each Plaintiffs work performance.

213.    At all material times, the workplace environment at ATLAS was "hostile" because it was both objectively and subjectively offensive.

214.    A reasonable person would have found Defendants' harassment offensive, and Plaintiffs themselves each personally found Defendants' harassment extremely offensive.

215.    At all material times, Defendant harassed each Plaintiff because she was a woman and specifically targeted her for maltreatment because of her sex.

216.    No male employees at ATLAS were subjected to anything close to the demeaning, disparaging, and humiliating harassment to which Defendant subjected each Plaintiff.

## COUNTI V:  NEGLIGENT RETENTION

217.    Plaintiffs hereby repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as if each has been fully set forth at length herein.

218.    At all material times, Darren Englund was employed by ATLAS SAND as a Lab Manager, and in that capacity supervised Plaintiffs BEAMAN and DICKINSON.

219.    Defendant ATLAS SAND knew or should have known that Darren Englund was hostile to women, sexist and obnoxious in how he treated women in the workplace, committed to driving all women technicians out of his plant operations, and knowingly intent on creating, fostering, and nourishing a hostile work environment at ATLAS SAND for Plaintiffs BEAMAN and DICKINSON and other women employees.

220.    At various material times, Plaintiffs BEAMAN and DICKINSON complained about Darren Englund's conduct, attitude, and treatment, but at no time did ATLAS SAND take any actions to protect the Plaintiffs, or to improve the work environment at ATLAS SAND for women, or to protect Plaintiffs from degrading conduct of other workers, disparate treatment, such as refusing to provide women with a clean and sanitary bathroom, refusing to properly investigate various hostile acts of mistreatments by male employees towards Plaintiffs, failing to provide Plaintiffs with work assignments commensurate with the work assignments assigned to Plaintiffs' male counterparts, and diminishing the responsibilities of Plaintiffs by shutting them out of meetings to which their male counterparts at ATLAS SAND were invited and participated in.

221.    At all material times, June Hoff was employed by ATLAS SAND as a Plant Supervisor, and in that capacity supervised Plaintiffs BEAMAN and DICKINSON.

222.    Defendant ATLAS SAND knew or should have known that June Hoff was hostile to women employees at ATLAS SAND, sexist in how she treated women in the workplace, committed to driving all women technicians out of ATLAS SAND plant operations, and knowingly intent on creating, fostering, and nourishing a hostile work environment at ATLAS SAND for Plaintiffs BEAMAN and DICKINSON and other women employees.

223.    At various material times, Plaintiffs BEAMAN and DICKINSO complained about June Hoff's conduct, attitude, and treatment, but at no time did ATLAS SAND take any actions to protect the Plaintiffs, or to improve the work environment at ATLAS SAND for women, or to protect Plaintiffs from degrading conduct of other workers, disparate treatment, such as refusing to provide women with a clean and sanitary bathroom, refusing to properly investigate various hostile acts of mistreatments by male employees towards Plaintiffs, failing to provide Plaintiffs with work assignments commensurate with the work assignments assigned to Plaintiffs' male counterparts, and diminishing the responsibilities of Plaintiffs by shutting them out of meetings to which their male counterparts at ATLAS SAND were invited and participated in.

224.    At all material times, as set forth herein, ATLAS SAND and high-ranking employees with remedial powers, had actual knowledge and constructive knowledge that ATLAS SAND employees Darren Englund and June Hoff had sever animus against women employees and a propensity to mistreat and discriminate against other female employees, including Plaintiffs BEAMAN and DICKINSON.

225.    Defendant ATLAS SAND negligently, recklessly, and wantonly retained Darren Englund with knowledge of his propensity for the type of behavior which resulted in Plaintiffs' injuries in this action.

226.     Defendant ATLAS SAND negligently, recklessly, and wantonly retained June Hoff with knowledge of her propensity for the type of behavior which resulted in Plaintiffs' injuries in this action.

227.     Defendant ATLAS SAND's conduct towards Plaintiffs, in connection with its negligent retention of Englund and Hoff, constitutes gross negligence.

228.     At all material times, Defendant ATLAS SAND's acts and failures to act created an unreasonable risk of harm to each Plaintiff, because ATLAS SAND failed to exercise even slight care or diligence towards each Plaintiff and other women employees at ATLAS SAND—and constituted gross indifference to the rights of Plaintiffs and other similarly situated women employees at ATLAS SAND, utter disregard of prudence, and a complete neglect of the safety of Plaintiffs and other similarly situated women.

229.     At all material times, Defendant, ATLAS SAND's, conduct towards Plaintiffs was willful, wanton, intentional, and malicious, and constituted evil-minded acts accompanied by a wanton and willful disregard of Plaintiffs' rights, interests, and welfare.

230.     At all material times, Defendant ATLAS SAND's conduct towards Plaintiffs was seriously harmful to the public, which has a compelling interest in ensuring that women are not subject to gender discrimination in the workplace.

231.     Defendant ATLAS SAND's conduct towards Plaintiffs gives rise to punitive damages, as well as compensatory damages.

232.     As a direct and proximate result of the foregoing, Plaintiffs sustained physical, emotional, and psychological injuries, along with pain and suffering.

### *AD DAMNUM* CLAUSE

**WHEREFORE**, based on the aforesaid, Plaintiffs, FRANCIS BEAMAN, LAURA DICKINSON, and WENDY DEAN, hereby demand judgment in their favor and against the Defendant, ATLAS SAND COMPANY, LLC, as follows:

1.      All general, special, incidental, and consequential damages in a sum to be determined at trial;

2.      All damages to which Plaintiffs maybe entitled pursuant to this Complaint, or any amendments thereto, including but not limited to back pay, reinstatement, front pay, statutory relief at law, and equity;

3.      Compensatory damages for pain and mental suffering in an amount to be determined at trial;

4.      Punitive damages in an amount to be determined at trial;

5.      Reasonable attorneys' fees, pursuant to 42 U.S.C. Sec. 1988, or other appropriate authority;

6.      Pre-judgment interest at the highest rate permitted by law;

7.      Post-judgment interest from the judgment until paid at the highest rate permitted by law;

8.      Costs of court; and

9.      Any other, different, or further relief to which Plaintiffs may be entitled and/or to which this Court may seem just, proper, or necessary.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  May 13, 2022

Orangeburg, New York

**KILGORE & KILGORE, PLLC**

*Clark B. Will /S*
_____
CLARK B. WILL, ESQ. (CBW),
*A Member of the Firm*
3109 Carlisle Street
Dallas, Texas 75204
(214) 379-0834
cbw@kilgorelaw.com

**Attorneys for Plaintiffs**

**KEVIN T. MULHEARN, P.C.**

*Kevin T. Mulhearn /S*
_____
KEVIN T. MULHEARN, ESQ. (KM 2301)
60 Dutch Hill Road, Suite 6B
Orangeburg, New York 10962
(845) 222-8092
kmulhearn@ktmlaw.net